# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
 *Plaintiff-Appellant,*

v.

PROSPECT AIRPORT SERVICES, INC,
 *Defendant-Appellee.*

No. 07-17221

D.C. No.
CV-05-01125-
KJD/GWF

OPINION

Appeal from the United States District Court
for the District of Nevada
Kent J. Dawson, District Judge, Presiding

Argued and Submitted
April 16, 2009—San Francisco, California

Filed September 3, 2010

Before: Andrew J. Kleinfeld, Milan D. Smith, Jr., and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Kleinfeld

## COUNSEL

Dori K. Bernstein, U.S. Equal Opportunity Commission, Office of General Counsel, Washington, D.C., for the appellant.

Thomas W. Murphy (argued), Lauren Blair (briefed), Pedersen & Houpt, Chicago, Illinois, for the appellee.

## OPINION

KLEINFELD, Circuit Judge:

This is a sexual harassment case in which a male employee was the victim of a female co-worker.

## I.  Facts.

The district court granted summary judgment against the plaintiff, so we recite the facts in accord with the cognizable evidence presented by the plaintiff, to determine whether, if a jury accepted his account, he could recover.[1] We review summary judgment de novo.[2]

The plaintiff, Rudolpho Lamas, and the alleged harasser, Sylvia Munoz, worked for Prospect Airport Services, Inc. They worked at McCarran International Airport in Las Vegas helping passengers who needed wheelchairs. Lamas was promoted from "passenger service assistant" to "lead passenger service assistant."[3] His wife died September 17, 2001, so at the times relevant to this case he was a recent widower.[4] He started working for Prospect the next spring, in April 2002.[5]

That fall, a married co-worker, Sylvia Munoz, began a series of rejected sexual overtures. Although Lamas had never asked her out or otherwise made overtures to her, she handed him love notes and made remarks to him that "hurt" him and were "embarrassing."[6] "And she was insistent and it bothered

---

[1]*See Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1053 (9th Cir. 2007).

[2]*Id.*

[3]Lamas Dep. at 14.

[4]ER Vol 2 at 40, 42; Lamas Dep. at 6, 26.

[5]Lamas Dep. at 14.

[6]ER Vol. 2 at 42; Lamas Dep. at 25.

me."[7] When he asked her why she thought he was interested, she said she had heard from another coworker that he missed coming home to a family. The context had been that he was still in mourning about his wife, but Munoz thought it meant he was looking for female companionship. In his deposition, he cried as he recounted this.[8] She said that he had once mentioned as they passed in a Jetway that he was single, she had asked her husband if that meant he was flirting with her, and her husband said that it did.[9] She subsequently wrote and hand-delivered a note to him that he interpreted as a "flirtatious come-on."[10] It was the first of three or four notes.

The first note, which Munoz handed to Lamas around mid-to-late November, said she was "turned on" and wanted to "go out."[11] Lamas interpreted it as a "basic flirtatious come-on" and an "unwanted flirtatious advance" and told her he was not interested.[12] She asked "why not?" and he replied that he just was not interested.[13]

Lamas was bothered by the note, so he informed their boss, Assistant General Manager Patrick O'Neill.[14] O'Neill advised Lamas to tell Munoz that the romantic interest was not mutual and that Lamas should let Prospect's managers know if she kept it up, so that they could take care of it.[15] Lamas did not want to make a complaint against Munoz, he just wanted the overtures to stop.[16]

---

[7]ER Vol. 2 at 42; Lamas Dep. at 25.

[8]ER Vol. 2 at 42; Lamas Dep. at 25-26.

[9]ER Vol. 2 at 42-43; Lamas Dep. at 26-27.

[10]ER Vol 2 at 44; Lamas Dep. at 32.

[11]ER Vol. 2 at 44; Lamas Dep. at 32, 34.

[12]ER Vol. 2 at 44; Lamas Dep. at 32 -34.

[13]ER Vol. 2 at 44; Lamas Dep. at 33-34.

[14]ER Vol. 2 at 44; Lamas Dep. at 31-32.

[15]ER Vol. 2 at 44; Lamas Dep. at 32.

[16]Lamas Dep. at 155-58.

Taking O'Neill's advice, Lamas told Munoz:

> I'm not interested. You're married. And I don't want
> to get involved in something like that. And, you
> know, I'm just not looking for any kind of thing like
> that right now. So I wouldn't be interested in it. But,
> you know, I read the note. . . . I read it. But I'm not
> interested.[17]

Lamas did not feel his work environment had become abusive
at that point, he just did not want to have a relationship with
her.[18]

But she did not stop. A few days later, Munoz handed
Lamas a second note saying she was serious and he should
give her a chance.[19] He still did not feel his work environment
had become abusive, he just did not want a relationship with
her and wanted her to stop. He read and discarded the note.[20]

But she did not stop. Munoz approached Lamas in the park-
ing lot and handed him a picture of herself, "a head and
shoulders-type shot with a pressing together of the breasts
. . . . no clothing on that portion . . . . the cleavage of the
breasts sort of together."[21] He gave the picture back to her,
and was "irritated. She was bothering me, pestering me."[22] He
told her "I've told you already, I'm not interested."[23] Lamas
told a friend that Munoz's advances were "weight on my
shoulders," and "just terrible."[24]

---

[17]ER Vol. 2 at 44; Lamas Dep. at 33.

[18]Lamas Dep. at 38.

[19]Lamas Dep. at 36-38.

[20]Lamas Dep. at 38.

[21]ER Vol. 2 at 49; Lamas Dep. at 60-62.

[22]ER Vol. 2 at 50; Lamas Dep. at 63-64.

[23]ER Vol. 2 at 50; Lamas Dep. at 64, 66.

[24]ER Vol. 2 at 50; Lamas Dep. at 65.

Lamas then went to his immediate boss, Ronda Thompson, about the problem. He "wanted her to follow the company procedure to put a stop to it."[25] He told his boss that Munoz "was making these unwanted advances," things were "out of hand," and the harassment was hurtful.[26] Thompson told him that she would talk to Munoz and would inform Prospect's general manager, Dennis Mitchell, of the problem.[27] But Ronda Thompson did not do either, and Munoz kept it up.

Munoz gave Lamas a third note, and at this point he felt his work environment had become abusive.[28] This time Munoz wrote Lamas that she was having "crazy dreams about us in the bathtub" and boasted that she gave a "very good bath wash and body massage."[29] Lest there be any doubt, Munoz said "I do want you sexually and romantically":

> Dear R.,
>
> I guess this is the only form off [sic] communication we have. I try to call you one night about three weeks ago when I was thinking of you. They said that you moved! I've been thinking of you a lot lately. I've been having crazy dreams about us in the bath tub yeah in the bath tub. Must be my Aunt's cooking. (Ha, Ha). I've been wanting to ask you, but you have been under a lot of stress with southwest and work. It is time to unwind and be stress free. I give out very good bath wash and body massage. It sounds a little crazy but everyone has a little craziness in them! I would love to see you on and off. Yes, I've been thinking about you more ways then

---

[25]ER Vol. 2 at 45; Lamas Dep. at 39, 41.

[26]ER Vol. 2 at 45; Lamas Dep. at 40, 46.

[27]ER Vol. 2 at 44, 46; Lamas Dep. at 40, 47.

[28]Lamas Dep. at 38.

[29]ER Vol. 2 at 62.

[sic] one. It seems to me I cannot get you off my mind no matter how hard I try! I hope you will consider? I'll take care of you, you take care of me! Please let me know soon *not* later! Seriously, I do want you sexually and romantically!

Con amor (with love), S.[30]

In January or February, after several months of Munoz's pressure and after he had received the third note, Lamas talked to the supervisor next up the chain, Dennis Mitchell.[31] By now Munoz had recruited co-workers who were telling Lamas that Munoz loved him and wanted him, and he was telling the messengers that the interest was not mutual.[32] "[C]o-workers were now saying things, and I was starting to become embarrassed."[33] He suspected (correctly) that his boss, Ronda Thompson, had not talked to Munoz despite telling him that she would, so Lamas called Prospect's manager at the airport, Dennis Mitchell.[34] Lamas gave Mitchell the note and asked him to tell Munoz to stop sending letters and "making advances."[35] In response, Mitchell told Lamas that he "did not want to get involved in personal matters."[36] Lamas did not file a written complaint against Munoz (the company's sexual harassment policy did not require a written complaint),[37] but asked that Munoz be made to stop.[38]

---

[30]ER Vol. 2 at 62.

[31]ER Vol. 2 at 47; Lamas Dep. at 51-53.

[32]ER Vol. 2 at 46; Lamas Dep. at 50-51.

[33]ER Vol. 2 at 47; Lamas Dep. at 53.

[34]ER Vol. 2 at 48; Lamas Dep. at 55; ER Vol. 2 at 70-71, 101, 103, 106; Mitchell Dep. at 79-80, 85-86.

[35]ER Vol. 2 at 99; Mitchell Dep. at 70.

[36]ER Vol. 2 at 99; Mitchell Dep. at 70.

[37]ER Vol. 2 at 68.

[38]ER Vol. 2 at 59; Lamas Dep. at 125-26.

Mitchell agreed to speak to Munoz as "a favor."[39] He acknowledged that Munoz's "sloppy love letter" was a violation of Prospect's sexual harassment policy.[40] A few days later Mitchell ran into Munoz and met with her and Ronda Thompson.[41] He told Munoz that he knew she was "pursuing a coworker . . . and the [ ] coworker wanted these advances to stop."[42] Munoz nodded.[43] He told her that "if I hear any more —if this is brought up again and I hear that [ ] it is continuing, I would have to take action."[44] This was in late January or early February of 2003.[45]

But Munoz did not stop. Every time Lamas walked by her at work, there was "something, some gesture some 'Hey, hey' wording or 'Whew, whew,' " licking her lips suggestively, and asking if Lamas "want[ed] to have some fun."[46] Munoz performed "blow job imitations."[47] Lamas "hated it" because "[i]t was just constantly something," "[i]t was like pressure," and offensive.[48] Instead of occasional approaches, she now harassed Lamas every day.[49] Munoz also had co-workers deliver messages to Lamas about going on dates, that Munoz "was going to get" Lamas "no matter what," and other "hurtful, embarrassing things" that caused Lamas to feel "constant pressure" at work.[50] This continued through the spring of 2003.

---

[39]ER Vol. 2 at 99; Mitchell Dep. at 70.

[40]ER Vol. 2 at 100; Mitchell Dep. at 73.

[41]ER Vol. 2 at 100-01; Mitchell Dep. at 76-77.

[42]ER Vol. 2 at 101; Mitchell Dep. at 78.

[43]ER Vol. 2 at 101; Mitchell Dep. at 78.

[44]ER Vol. 2 at 103; Mitchell Dep. at 86.

[45]ER Vol. 2 at 50; Lamas Dep. at 63.

[46]ER Vol. 2 at 51, 56; Lamas Dep. at 67, 70, 113.

[47]ER Vol. 2 at 56; Lamas Dep. at 113.

[48]ER Vol. 2 at 51, Lamas Dep. at 67.

[49]ER Vol. 2 at 51; Lamas Dep. at 67-68.

[50]ER Vol. 2 at 60; Lamas Dep. at 167.

At about this time, co-workers began to speculate that Lamas was a homosexual.[51] In addition to Munoz's remarks and gestures, Lamas had to face co-workers' remarks to the effect that he was gay. Lamas felt helpless and was crying.[52] He consulted a psychologist about his distress.[53] But things kept getting worse. He complained to four different Prospect management officials about Munoz's harassment, but nothing was done to stop it.[54] Patrick O'Neill, Prospect's assistant general manager, said the harassment "was a joke" and that Lamas should "walk around singing to yourself . . . I'm too sexy for my shirt."[55] Lamas did not feel a song in his heart. He felt "bound and gagged" because "[n]obody listened" and Prospect "just wouldn't do anything."[56]

Meanwhile, Munoz kept it up. Munoz approached Lamas in May 2003 when he was helping elderly passengers, a gentleman and his wife, with a wheelchair for the husband.[57] Continuing more than six months of pressure to have sex, Munoz asked Lamas to join her for a date, and said she had been lacking in sexual gratification because she and her husband had separated.[58] Munoz's comments embarrassed the elderly man's wife as well as Lamas.[59]

Lamas had previously done well on the job. He had been promoted to lead passenger service assistant.[60] Munoz's reference to Lamas being "under a lot of stress with southwest and

---

[51]Lamas Dep. at 167.

[52]Lamas Dep. at 167-68.

[53]Lamas Dep. at 168.

[54]ER Vol. 2 at 52-54; Lamas Dep. at 71, 87, 89.

[55]ER Vol. 2 at 53-54, Lamas Dep. at 86-87.

[56]ER Vol. 2 at 60; Lamas Dep. at 167, 168.

[57]ER Vol. 2 at 55-56; Lamas Dep. at 110-113.

[58]ER Vol. 2 at 55-56; Lamas Dep. at 110-113.

[59]ER Vol. 2 at 55-56; Lamas Dep. at 110-113; ER Vol. 2 at 67.

[60]ER Vol. 2 at 21.

work" in her I-give-good-bath-wash letter[61] referred to one of Lamas's job assignments. Southwest Airlines had threatened to end Prospect's contract, so the Prospect managers assigned Lamas to work the Southwest concourse in an attempt to save it, "because they believed I was the best performer."[62] But, according to Lamas, the psychological distress because of the "constant pressure" from Munoz made his performance suffer. When it was a bad day, the customers would pick up on it, "[s]o in that sense it interfered with my ability to perform the job up to the standard I wanted to perform the job."[63] In March, after four or five months of harassment and no protection from management, Prospect demoted Lamas because of "complaints about [ ] job performance and negative attitude."[64]

Prospect fired Lamas in June, for failing to provide wheel chair assistance to a passenger, poor attitude, and "lack of willingness to provide quality customer service."[65] Lamas attributes his diminished work performance to the stress caused by more than half a year of harassment.[66]

Prospect has a sexual harassment policy which both Lamas and Munoz signed. The policy specifies, under the heading "Complaint Procedure," that "[a]ny incident, which may be a violation of this policy, should be promptly reported to your supervisor."[67] There was no requirement that the report be in writing or that it seek any discipline against the person doing the harassing. The policy says Prospect "will investigate each complaint in a prompt and proper fashion" and that complaints will be kept confidential to the extent possible.[68] Pros-

---

[61]ER Vol. 2 at 62.

[62]ER Vol. 2 at 46; Lamas Dep. at 49..

[63]ER Vol. 2 at 55; Lamas Dep. at 115-116.

[64]ER Vol. 2 at 86.

[65]ER Vol. 2 at 87.

[66]ER Vol. 2 at 55; Lamas Dep. at 115-116; Lamas Dep. at 149.

[67]ER Vol. 2 at 68.

[68]ER Vol. 2 at 68.

pect's human resources manager testified that this means an "immediate review" and investigation.[69] Munoz was not disciplined (even though men had been fired under the policy, in one case for sexually harassing a woman,[70] in another for looking at pornography on the job).[71] Lamas filed an EEOC complaint. The EEOC determined that Lamas was subjected to a sexually hostile work environment. The EEOC, not Lamas, is the plaintiff in this lawsuit.

The district court granted Prospect's motion for summary judgment.[72] The district court concluded that as a matter of law Munoz's conduct was not severe and pervasive enough to amount to sexual harassment objectively for a reasonable man, noting that "Lamas admits that most men in his circumstances would have 'welcomed' the behavior he alleged was discriminatory, but that due to his Christian background he was 'embarrassed.' "[73] The court emphasized that Lamas had never filed a written complaint, and management had told Munoz that her behavior was inappropriate.[74]

The EEOC appeals.

## II.    Analysis.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review a grant of summary judgment de novo.[75] All reasonable inferences "upon which a reasonable jury might return a verdict" must be drawn in favor of the nonmoving party.[76]

---

[69]Claypool Dep. at 55.

[70]Claypool Dep. at 58.

[71]Mitchell Dep. at 47-48.

[72]ER Vol. 1 at 13.

[73]ER Vol. 1 at 10.

[74]ER Vol. 1 at 11-12.

[75]*Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1053 (9th Cir. 2007).

[76]*Id.*

Summary judgment may only be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

**[1]** Title VII of the 1964 Civil Rights Act prohibits discrimination on the basis of sex, which includes sexual harassment in the form of a hostile work environment.[77] Both sexes are protected from discrimination.[78] To survive summary judgment, the respondent must submit cognizable evidence sufficient to establish a jury question on whether the victim (1) was subjected to verbal or physical conduct of a sexual nature, (2) that was unwelcome; and (3) that was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.[79] The respondent must present sufficient evidence for a jury question on whether the work environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile and one that the victim in fact did perceive to be so."[80]

## 1. Conduct of a Sexual Nature

**[2]** Whether Lamas was subjected to "verbal or physical conduct of a sexual nature"[81] is an easy question. Munoz

---

[77]42 U.S.C. § 2000e-2(a)(1); *Meritor Sav. Bank, FSB, v. Vinson*, 477 U.S. 57 (1986). The only claim before this court is the EEOC's hostile work environment claim.

[78]*Craig v. Boren*, 429 U.S. 190, 210 (1976) (invalidating a state law that created different legal drinking ages for men and women as unconstitutionally discriminatory); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) ("Title VII's prohibition of discrimination because of sex protects men as well as women. . . .") (internal quotation marks and citation omitted).

[79]*Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995); *see also M & O Agencies*, 496 F.3d at 1055.

[80]*Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864, 871-72 (9th Cir. 2001) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).

[81]*Fuller*, 47 F.3d at 1527.

propositioned him for sex. Munoz wrote to him that she dreamed of him in a bath, that she gave good "body wash," and that she wanted him "sexually." She performed gestures simulating fellatio, and gave him a photograph of herself emphasizing her breasts and possibly without clothes on. Her proposition was for sex, not a cup of coffee together. After she recruited coworkers to pressure Lamas, they mocked him by suggesting that he was homosexual.

### 2.    Welcomeness.

[3] It cannot be assumed that because a man receives sexual advances from a woman that those advances are welcome. Lamas suggested this might be true of other men (the district court decision noted that Lamas "admits that most men in his circumstances would have 'welcomed' " her advances). But that is a stereotype and welcomeness is inherently subjective,[82] (since the interest two individuals might have in a romantic relationship is inherently individual to them), so it does not matter to welcomeness whether other men might have welcomed Munoz's sexual propositions.

It would not make sense to try to treat welcomeness as objective, because whether one person welcomes another's sexual proposition depends on the invitee's individual circumstances and feelings. Title VII is not a beauty contest, and even if Munoz looks like Marilyn Monroe, Lamas might not want to have sex with her, for all sorts of possible reasons. He might feel that fornication is wrong, and that adultery is wrong as is supported by his remark about being a Christian. He might fear her husband. He might fear a sexual harassment complaint or other accusation if her feelings about him changed. He might fear complication in his workday. He might fear that his preoccupation with his deceased wife would take any pleasure out of it. He might just not be

---

[82]*Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864, 873 (9th Cir. 2001).

attracted to her. He may fear eighteen years of child support payments. He might feel that something was mentally off about a woman that sexually aggressive toward him. Some men might feel that chivalry obligates a man to say yes, but the law does not.

That is not to say that there is nothing objective about welcomeness. For the conduct to be unwelcome for purposes of employer's liability for not stopping it,[83] unwelcomeness has to be communicated. Sometimes the past conduct of the individuals and the surrounding circumstances may suggest that conduct claimed to be unwelcome was merely part of a continuing course of conduct that had been welcomed warmly until some promotion was denied or employment was terminated. That is a credibility issue.[84]

**[4]** But here Lamas unquestionably established a genuine issue of fact regarding whether the conduct was welcome. Lamas swore under oath that it was not. It made him cry, both at the time and repeatedly in the deposition. He sought medical services to deal with the anxiety it caused him. Lamas had no prior romantic or sexual relationship with Munoz. He did not approach her. He told her expressly and plainly that he did not want a relationship with her. He explained his troubled response plausibly, as stemming from his Christian beliefs and his recent widowhood. Some recipients of sexual advances doubtless have difficulty coming up with a tactful way to refuse them without damaging their ability to get along at work, so unwelcomeness may in some cases be unclear. Here, though, Lamas repeatedly told Munoz "I'm not interested" and that he was "just not looking for any kind of thing like that" yet she kept making the sexual overtures she knew were unwelcome.

---

[83]*See Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir. 2000).

[84]See *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986).

### 3.  Severe or pervasive.

Title VII is not a "general civility code."[85] A violation is not established merely by evidence showing "sporadic use of abusive language, gender-related jokes, and occasional teasing."[86] A violation is established when the unwelcome sexual conduct is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[87] Whether a working environment is objectively "abusive" "can be determined only by looking at all the circumstances," which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. . . . [N]o single factor is required."[88] The "severe or pervasive" element has both objective and subjective components. We consider not only the feelings of the actual victim, but also "assume the perspective of the reasonable victim."[89] There is a subjective requirement as well as an objective requirement, because "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment."[90]

Not all propositions for romance or more are sexual harass-

---

[85]*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

[86]*Id.*; *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998) (distinguishing "simple teasing" from conduct which creates a hostile work environment); *Candelore v. Clark County Sanitation Dist.*, 975 F.2d 588, 590 (9th Cir. 1992) ("isolated incidents of sexual horseplay" did not create a hostile work environment); *Jordan v. Clark*, 847 F.2d 1368, 1374-75 (9th Cir. 1988) (men and women telling "off-color" jokes at work did not create an abusive environment).

[87]*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

[88]*Id.* at 23.

[89]*Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir. 2000).

[90]*Harris*, 510 U.S. at 21-22.

ment. People spend most of their waking hours with other people at their workplaces, so that is where many meet and begin social relationships, and someone has to make the first overture. Some people have more social finesse than others, and many might suggest coffee or a trip to an art exhibition rather than sex, but mere awkwardness is insufficient to establish the "severe or pervasive" element. Had Munoz merely asked Lamas to go out on a date, or to see whether they might have a romantic relationship, or straightforwardly propositioned him for sex, and then quit when he clearly told her no, the EEOC would not have shown enough evidence to survive summary judgment.[91]

To be actionable, the conduct must go beyond the "merely offensive" so that it changes the terms and conditions of the victim's job. Because a "sexual harassment case" is against the employer, not the harasser, and "only the employer can change the terms and conditions of employment, an isolated incident of harassment by a coworker will rarely (if ever) give rise to a reasonable fear that sexual harassment has become a permanent feature of the employment relationship."[92] We weigh both severity and pervasiveness to evaluate whether a reasonable victim would think that sexual harassment had become a permanent feature of the employment relationship. And because only an employer can change the terms and conditions of employment, that will rarely if ever be the case, if the employer takes appropriate corrective action upon finding out about the harassment.[93] At least for coworker sexual harassment, the employer could not reasonably be expected to think an abusive environment had been created for an

---

[91]*Cf. Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (finding no hostile work environment where a superior asked employee for dates, called her a "dumb blond," put his hand on her shoulder several times, placed "I love you" signs in her work area, and tried to kiss her in a bar).

[92]*Brooks*, 229 F.3d at 924.

[93]*Id.*

employee if the employer did not know of the conduct and its unwelcomeness. But here it did.

**[5]** Munoz's first advances were unwelcome, but Lamas did not feel his work environment was abusive based on these initial contacts. In light of Lamas's testimony that he did not feel abused until Munoz made her third invitation, had Munoz stopped when Lamas told her clearly and explicitly after each of the first two notes that he was not interested, the EEOC would not have a triable issue of fact on unwelcomeness. But Lamas testified that the third invitation was unwelcome and abusive, and the record, taken in the light most favorable to Lamas, shows that Lamas was perfectly clear that these advances were unwelcome. (We do not imply some fixed rule that a third invitation for a date is necessarily over the line, because rejections often leave future possibilities unclear.)

**[6]** Munoz's continued advances created an environment that Lamas reasonably perceived as hostile and abusive. Lamas' emotional testimony about his reaction to Munoz's letters and gestures, his co-workers' statements about Munoz's interest in him, his complaints to his supervisors and Prospect managers, as well as his complaints to the EEOC and State of Nevada all evidenced pervasiveness amounting to an abusive work environment.[94] As increased frequency and pervasiveness of the advances as well as his other co-workers' messages from Munoz and ridicule crossed the line over into abusiveness, he continued to complain to his supervisors and demonstrated his sense of being abused.[95]

**[7]** Next we must consider whether a reasonable victim in the same circumstances would have perceived the working

---

[94]*See M & O Agencies*, 496 F.3d at 1055 (victim's continued complaints to supervisors and testimony that verbal abuse made her uncomfortable and upset at work established subjective perception of abusive environment to state a prima facie case).

[95]*See Nichols*, 256 F.3d at 873-74.

environment created by Munoz's conduct as abusive. Munoz's advances were not severe, as these cases go. The only touching was a kiss on the cheek. She used words, gestures, and a photograph, not unwanted touching, to communicate her desires. The EEOC is correct, though, that the pervasiveness and the inadequate response by the employer established a jury question of whether her overtures led to an abusive environment. We have held that "[t]he required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct."**96** In *Draper v. Coeur Rochester, Inc.*, we held that there was a genuine issue of material fact on hostile work environment where the conduct at issue consisted only of pervasive remarks over an extended period of time.**97**

**[8]** Munoz's pursuit of Lamas was relentless. She would not leave him alone, despite his repeated clear rejections of her overtures. She recruited other co-workers to deliver messages to him; the campaign broadened to include the whole workplace. Other workers began mocking Lamas for his failure to respond to Munoz's sexual advances. Lamas described over six months of constant (and often daily) sexual pressure and humiliation from Munoz and other co-workers. The constant ridicule and taunting from Lamas' co-workers as a result of Munoz's advances is similar to the abusive ridicule we found actionable in *Nichols v. Azteca Restaurant Enterprises, Inc.*.**98**

**[9]** The evidence in the record creates a genuine issue of material fact that Lamas's work was impaired by Munoz's sexual advances. He reported that he began crying at work, sought medical help for his psychological problem, and the quality of his work deteriorated on account of the pervasively abusive environment. He went from being the well-respected

---

**96***Id.* at 872.

**97***Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1105 (9th Cir. 1998).

**98***Nichols*, 256 F.3d at 870.

employee, used to try to retain the Southwest Airlines contract, to being fired. He conceded that the quality of his work deteriorated because of his psychological difficulties on account of the Munoz campaign of harassment.

### 4.   Prospect Airport's response.

**[10]**  An employer is liable for a employee's sexual harassment of a coworker if it knew, or should have known, about the harassment and failed to take prompt and effective remedial action.[99] "Harassment is to be remedied through actions targeted at the *harasser*, not at the victim[.]"[100] The record establishes that a jury could reasonably find that Prospect knew about the harassment, and that its response was inadequate. Lamas complained to his employer, but Prospect's responses were ineffectual, and known by Prospect to be ineffectual. His immediate supervisor, Ronda Thompson, failed even to tell Munoz to stop. He repeatedly brought his concerns to others in management, and a manager told Munoz to stop, but management did nothing about it when Munoz did not stop, and management knew she had not. Instead the assistant general manager told Lamas to sing to himself "I'm too sexy for my shirt."

**[11]** Prospect's actions were not enough to establish an affirmative defense for Prospect. "If the employer fail[s] to take even the mildest form of disciplinary action the remedy is insufficient under Title VII."[101] Prospect did nothing about Munoz, instead telling Lamas to console himself by saying "I'm too sexy for my shirt." Men as well as women are entitled under Title VII to protection from a sexually abusive work environment.[102] Lamas submitted evidence that Prospect knowingly denied him protection.

---

[99]*See, e.g.*, *Meritor Sav. Bank, FSB v Vinson*, 477 U.S. 57, 67 (1986); *Intlekofer v. Turnage*, 973 F.2d 773, 780 (9th Cir. 1992).

[100]*Intlekofer*, 973 F.2d at 780 n.9.

[101]*Id.* at 779 (citations and quotations omitted).

[102]*See Oncale*, 523 U.S. at 82 (sexual harassment of male employee by male co-workers violated Title VII); *Nichols*, 256 F.3d at 875 (harassment of male employee by co-workers for failure to conform to gender-based stereotypes created hostile work environment in violation of Title VII).

**REVERSED.**