Opinion by Judge ARNOLD; Partial Concurrence and Partial Dissent by Judge RAWLINSON.
OPINION
ARNOLD, Senior Circuit Judge:
Jennifer Westendorf brought a Title VII action against her former employer, West Coast Contractors, claiming sexual harassment and retaliatory discharge. The district court granted summary judgment to West Coast, and Ms. Westendorf appeals. We affirm the judgment on the harassment claim, and reverse and remand the retaliation claim for further proceedings.
I.
We view the evidence and inferences from it favorably to Ms. Westendorf. See Nilsson v. City of Mesa, 503 F.3d 947, 951 (9th Cir.2007). In February, 2008, Ms. Westendorf began working for West Coast as a project manager assistant under the supervision of Project Manager Dan Jos-lyn. She worked in that position until Mario Ramirez, company president, terminated her on July 29 of the same year.
During the first month of her employment, Mr. Joslyn once referred to Ms. Westendorfs duties as “girly work” and quickly apologized. She didn’t complain, but Mr. Ramirez heard about the remark and told her that he would speak to Mr. Joslyn about it; he also said that Mr. Joslyn had had previous problems with employees and that she should tell him if Mr. Joslyn did anything inappropriate. Mr. Joslyn called Ms. Westendorf six weeks later saying that Mr. Ramirez had talked to him about the “girly work” remark, and asked Ms. Westendorf “what the hell” she had said to Mr. Ramirez. When she told Mr. Joslyn that she hadn’t reported the incident, he hung up after saying that he’d “been through this shit before” and that “it’s just not happening” again.
In May, Ms. Westendorf began working once a week in a trailer at a construction site, where she assisted with subcontractors’ meetings and performed other tasks. Patrick Ellis, whom Mr. Joslyn also supervised, had his office at the trailer, and he began making offensive sexual comments to Ms. Westendorf. On one occasion, Mr. Ellis announced that a large-breasted woman, whom he called “Double D,” would be at a West Coast barbecue. When the woman arrived at the event, Mr. Joslyn and Mr. Ellis remarked on her breast size and asked Ms. Westendorf whether the size of the woman’s breasts intimidated her. In June, Mr. Ellis made some comments to Ms. Westendorf about tampons and asked whether women “got off’ when they used a particular kind. Around the same time, Mr. Ellis told her that “women were lucky because [they] got to have multiple orgasms.” During each of these incidents, Ms. Westendorf demanded that Mr. Ellis stop. Mr. Joslyn participated with Mr. Ellis in commenting on the breast size *420 of the woman at the barbecue, and he merely smiled or chuckled when he was present for Mr. Ellis’s other offensive remarks. Ms. Westendorf reported each incident to Mr. Ramirez, who would say that he’d talk to Mr. Ellis and that the behavior had to stop. His offensive behavior nevertheless continued. Beginning in May, whenever Ms. Westendorf saw Mr. Ellis or she answered his phone calls to the main office, he would tell .her that she had to clean the trailer while wearing a French maid’s costume (or maid’s uniform) or would.make a similar comment to her. In early July, Ms. Westendorf told Mr. Ramirez that Mr. Ellis had said “f_you” to her several times during a disagreement and when she asked Mr. Joslyn to intervene, he just smiled.
On July 14, Mr. Ramirez arranged to have a court reporter make a record while he questioned Ms. Westendorf, Mr. Joslyn, and Mr. Ellis separately about Ms. Wes-tendorf s complaints. During Ms. Westen-dorf s interview, she complained about Mr. Ellis’s sexual remarks and objected to Mr. Joslyn’s failure to do anything to stop them. She also said that she was worried about Mr. Joslyn’s reaction to her complaints, and she explained that after she last talked to Mr. Ramirez about him, Mr. Joslyn had phoned her to say that “he didn’t need this shit anymore.” When he interviewed Mr. Joslyn, Mr. Ramirez said that Ms. Westendorf had complained about his failure to do anything about Mr. Ellis’s offensive sexual comments. And he warned Mr. Joslyn that the next time he failed to do anything about an offensive comment to Ms. Westendorf and “she start[ed] bringing up this thing,” Mr. Ramirez would have to take “drastic” action, including possibly terminating Mr. Joslyn. Mr. Ramirez told Mr. Joslyn that he was “an incredible, valuable employee.” In response, Mr. Joslyn said that he was “sick of this, totally sick of it.” He complained that “one word” could get him in trouble, and that he was now being told that he’d be fired if Mr. Ellis “was to say another derogatory word if I didn’t say nothin’.” Mr. Ramirez advised him to talk only about work to Ms. Westendorf.
Mr. Ramirez left for vacation about four days later, and Mr. Joslyn began treating Ms. Westendorf differently. He previously had praised her work but began criticizing it and doing what she referred to as “nit picking.” He also belittled her in front of subcontractors and started cursing at her for the first time; once when she brought him something that he’d requested, he asked, ‘What’s the matter, don’t you have a f_ing voice?”
Mr. Ramirez was back in the office on July 29. That morning, Mr. Joslyn criticized Ms. Westendorf for having told a subcontractor that the West Coast employees would not be able to come to the subcontractor’s social event because they would all be at Mr. Joslyn’s daughter’s wedding. Mr. Joslyn told Ms. Westendorf that he was “offended” at her using his daughter’s wedding as an excuse, and he said “f... you” to her three times while reprimanding her. Ms. Westendorf said, “I’m tired of this crap” and left the room, though she was supposed to attend a meeting that was about to start. Mr. Ramirez’s assistant told him that Ms. Westendorf was upset and had said that she didn’t want to work with Mr. Joslyn or Mr. Ellis; Mr. Ramirez called Mr. Joslyn and heard his rendition of the morning’s events.
Ms. Westendorf then arrived at Mr. Ramirez’s office, telling him that “things happened again” while he was gone and bringing a list of the incidents with her. Before she could explain fully, Mr. Ramirez questioned her about the subcontractor’s party invitation. Ms. Westendorf then began to tell Mr. Ramirez about how Mr. Joslyn *421 had been treating her. For example, she said that he had a binder in front of him and, when she handed him a piece of paper, he told her to put it in the binder herself, a task he had not asked her to do before. He then smirked at Mr. Ellis, while reprimanding Ms. Westendorf for not performing the task. Mr. Ramirez said that she should do what Mr. Joslyn told her to do, and Ms. Westendorf complained that Mr. Ramirez was not going to do anything about the problem. Finally, Mr. Ramirez said “that he was tired of listening to all this and that obviously [she] had a problem getting along with [Mr. Joslyn] and that it would be best if [she] got [her] personal items and left.” Mr. Ramirez and two other employees escorted her from the building. At her deposition, Ms. Westendorf testified that she was fired. Mr. Ramirez admitted that she was escorted from the building, but said that she had quit.
II.
To establish a hostile work environment claim based on sexual harassment, Ms. Westendorf had to show that she “was subjected to verbal or physical conduct of a sexual nature, ... that was unwelcome; and ... that was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.” See E.E.O.C. v. Prospect Airport Servs., Inc., 621 F.3d 991, 997 (9th Cir.2010). She had to present evidence to support a finding that a “reasonable person” would find her work environment to be “hostile or abusive” and that she in fact did so. Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).
In assessing whether the evidence could support a finding that Ms. Westen-dorf was subjected to a hostile or abusive work environment, we consider the conduct of both Mr. Ellis, her co-worker, and Mr. Joslyn, her immediate supervisor. An employer is liable for a hostile environment created by a plaintiffs co-worker if it knew or should have known about the misconduct and failed to take “prompt and effective remedial action.” Prospect Airport Servs., 621 F.3d at 1001. We consider Mr. Ellis’s offensive remarks in this context because Ms. Westendorf testified that they began in May and that she told Mr. Ramirez within three days of each incident, but the record would support a finding that he took no action until July 14. Because Mr. Joslyn supervised Ms. Wes-tendorf and West Coast did not establish an affirmative defense as a matter of law, we also consider his conduct when determining whether she made out a claim against the company. See Montero v. AGCO Corp., 192 F.3d 856, 861 (9th Cir.1999).
Having considered the evidence as a whole, we conclude that Ms. Westen-dorf did not make out a prima facie case of sexual harassment because the evidence will not support a finding that the offensive sexual conduct was so severe or pervasive that it altered the conditions of her employment and created a work environment that a reasonable person would consider hostile or abusive. “We weigh both severity and pervasiveness to evaluate whether a reasonable victim would think that sexual harassment had become a permanent feature of the employment relationship.” Prospect Airport Servs., 621 F.3d at 999-1000. To determine whether a hostile work environment claim is actionable, we consider all of the circumstances, which “ ‘may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d]’ ” with the employee’s work performance. *422 Id. at 998-99 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).
Although we certainly do not condone Mr. Ellis’s crude and offensive remarks, we note that Ms. Westendorf went to his workplace only once a week for three months and often did not stay an entire day. Other than his references to the French maid’s costume, Mr. Ellis reportedly made offensive sexual remarks to Ms. Westendorf on only about four occasions. Mr. Joslyn joined Mr. Ellis in the “Double D” comments but otherwise made no sexual remarks to Ms. Westendorf, and he quickly apologized for his “girly work” remark, which she did not deem serious enough to complain about. The harassment was not physical and Ms. Westendorf did not say that her work suffered because of it. Because we conclude that the evidence, viewed favorably to her, did not show sexual harassment that was sufficiently severe or pervasive to alter the terms of Ms. Westendorfs employment and subject her to an abusive environment, we affirm the judgment for West Coast on her sexual harassment claim.
III.
Ms. Westendorf also claimed that she was fired in retaliation for complaining about sexual harassment. To make out a prima facie retaliation case, she had to show that she engaged in protected activity, that she suffered a materially adverse action, and that there was a causal relationship between the two. See Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); Bergene v. Salt River Project Agric. Improvement & Power Dist., 272 F.3d 1136, 1140-41 (9th Cir.2001). An employee engages in protected activity when she opposes an employment practice that either violates Title VII or that the employee reasonably believes violates that law. See Freitag v. Ayers, 468 F.3d 528, 541 (9th Cir.2006), cert. denied, 549 U.S. 1323, 127 S.Ct. 1918, 167 L.Ed.2d 567 (2007); 42 U.S.C. § 2000e-3(a). Even though we have held that the evidence did not support Ms. Westendorfs sexual harassment claim, we think that it could support a reasonable belief that she was subjected to actionable sexual harassment, and that she had such a belief. In such circumstances, her complaints about that conduct would be protected activity.
The district court determined, however, based on Ms. Westendorfs deposition testimony, that she was claiming that Mr. Ramirez fired her only in retaliation for the complaints she had on July 29. The court also concluded that she then complained about Mr. Joslyn’s work-related comments during Mr. Ramirez’s absence, conduct that did not violate Title VII. Therefore, the court reasoned, her complaints at the relevant time were not protected conduct, and she did not make out a retaliation claim.
But we believe that the court did not comply with its obligation at summary judgment to view the evidence and all inferences from the evidence favorably to Ms. Westendorf, when it so strictly circumscribed her retaliation claim. We think that “reasonable minds could differ as to the import” of her deposition testimony, see Anderson v. Liberty Lobby, 477 U.S. 242, 250-51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and that the evidence and inferences from it, when viewed favorably to her, are sufficient to support a retaliation claim.
To make out such a claim, Ms. Westen-dorf had to show that her protected conduct was a but-for cause — but not necessarily the only cause — of her termination. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064-65 (9th Cir.2002). The *423 district court referred to Ms. Westendorfs deposition to support its conclusion that she alleged that she was fired solely for her July 29 complaints. At one point, Ms. Westendorf answered “yes,” when West Coast’s counsel asked whether she was claiming that she was terminated “because [she] complained on July 29th.” We think that this affirmative response is both general and ambiguous and in any case does not compel a conclusion that she claimed that Mr. Ramirez fired her solely because of her complaints about what happened during his absence. As one example, we think that Ms. Westendorfs answer may have meant merely that her complaining on that date had triggered Mr. Ramirez’s decision to fire her, not that he had no thought of all that had gone before. Mr. Ramirez himself testified that she came to his office saying that “things happened again” while he was gone, an obvious reference to the behavior she had complained about on July 14. And we believe that a reasonable inference could be drawn that her July 29 complaints about Mr. Joslyn would have brought to Mr. Ramirez’s mind her complaint about Mr. Joslyn only fifteen days earlier at interviews that Mr. Ramirez himself had arranged and conducted. He had thought her complaint serious enough at the time to bring it to Mr. Joslyn’s attention and even to warn him of possible termination. And we note Mr. Ramirez’s stated reason for firing her: According to Ms. Westendorf, he said “that he was tired of listening to all this and that obviously [she] had a problem getting along with [Mr. Joslyn] and that it would be best if [she] got [her] personal items and left.” The problem of Ms. Wes-tendorf and Mr. Joslyn not “getting along” had been well-illustrated during Mr. Ramirez’s interviews with them on July 14.
We conclude that the record evidence was sufficient to raise a material question of fact as to whether Ms. Westendorfs July 14 complaints — which we have already said could be “protected activity”— were a but-for cause of her termination. We therefore believe that the district court erred in granting the summary judgment motion on the ground that she failed to make out a prima facie case of retaliation.
The district court also held, in the alternative, that West Coast was entitled to summary judgment because Ms. Westen-dorf offered no evidence that its legitimate reason for terminating her was pretextual. See Dawson v. Entek Int’l, 630 F.3d 928, 936 (9th Cir.2011). We see no merit to this conclusion. First, West Coast did not offer any evidence of its reason for firing Ms. Westendorf because it denied doing so. Mr. Ramirez wrote to her specifically denying that he had fired her, and he testified to that effect at his deposition. Though he also testified that he would not rehire Ms. Westendorf because, in response to his hypothetical question on July 29, she said that she would not follow a direction from him that she did not agree with, he did not say that he terminated her for that reason. We believe, moreover, that even if West Coast had proffered this as a reason for discharging Ms. Westendorf, her prima facie case and related inferences might well support a finding of pretext, especially since she had no record of insubordination until she complained about sexual harassment. See Texas Dep’t of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).
We conclude that the evidence supports a finding that Mr. Ramirez fired Ms. Wes-tendorf because of her protected activity and would not otherwise have done so. We therefore reverse the entry of judgment for West Coast on the retaliation claim and remand to the district court for further proceedings not inconsistent with this opinion.
*424 AFFIRMED in part, REVERSED in part, and REMANDED. The parties shall bear their own costs on appeal.